IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,367

In the Matter of TROY D. RENKEMEYER,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed October 23, 2015. One year suspension.

*Deborah L. Hughes*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and *Troy D. Renkemeyer*, respondent, argued the cause pro se.

*Per Curiam*:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Troy D. Renkemeyer, of Overland Park, an attorney admitted to the practice of law in Kansas in 1997.

On June 30, 2014, the office of the Disciplinary Administrator filed a formal complaint against the respondent, alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed a motion for additional time to file answer on July 18, 2014, which was granted by order dated July 25, 2014. He filed his answer on August 7, 2014. On October 7, 2014, the parties entered into written stipulations.

A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on October 8, 2014, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated

1

KRPC 8.4(c) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct involving misrepresentation) and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law). Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"8.      The facts which give rise to this case can be found in an unpublished opinion in *Monarch Transport, LLC vs. FKMT, LLC, Scot Crader, and Troy Renkemeyer*, No. 105,487 (Kan. Ct. of App., August 17, 2012), which provides as follows:

'Per Curiam:  This appeal arises from claims surrounding the sale and subsequent failure of a trucking company known as Monarch Transport. The litigation before the district court involved three different cases that were consolidated for trial, many parties, and a host of claims and counterclaims. The main parties to this appeal are appellants FKMT, LLC (Old Monarch) and its principals, Troy Renkemeyer and Scot Crader, on the one side, and appellees Monarch Transport, LLC (New Monarch) and its principals, Thomas Kleinbeck and David Kleinbeck, on the other. SMR Holdings, LLC, a separate company owned by Renkemeyer, is also a party to this appeal.

'Factual and Procedural Background

'Renkemeyer and Crader are childhood friends. Renkemeyer is a lawyer and a certified public accountant, and Crader has a background in business and management. In 2004, Renkemeyer and Crader decided to start a trucking company, although neither had experience in the trucking industry. The company—Old Monarch—was incorporated under the name "Monarch Transport, LLC." Crader handled the day-to-day

2

operations, while Renkemeyer secured financing and handled some tax issues.

'In late 2006, Renkemeyer and Crader decided to sell the company. According to Renkemeyer, he would start or acquire a business, grow it, and then sell it for a profit. He testified that the company had grown significantly and that he and Crader believed it was a good time to list it for sale. But as New Monarch later alleged, the real reason for the sale was because the trucking company was in serious financial trouble.

'Regardless of the reasons motivating the sale, Crader and Renkemeyer listed the trucking company with Sunbelt Realtors, a business broker. Brothers Thomas Kleinbeck and David Kleinbeck were looking for business opportunities and were interested in the trucking company's listing. In August 2007, Thomas contacted Sunbelt and asked for financial information about the company, which Sunbelt provided. The Kleinbecks set up a meeting with Renkemeyer to obtain further information and discuss the possible sale of the company. According to Thomas, Renkemeyer lied about or failed to disclose vital information during this meeting. Renkemeyer denied lying about or withholding information. He further testified that the Kleinbecks were not interested in the trucking company's liabilities because any sale would be an asset sale only and thus they would not be assuming the trucking company's liabilities.

'In mid-September 2007, the Kleinbecks toured the trucking company's facilities along with their banker at UMB Bank. During the tour, the Kleinbecks met with Crader and asked him to stay on as general manager after the sale. The Kleinbecks believed Crader would be able to handle many issues related to the sale, such as making sure that insurance was available and registering with tax authorities.

'The Kleinbecks had a second meeting with Renkemeyer, during which they discussed the possibility of buying the name "Monarch Transport, LLC" from Old Monarch in order to maintain customer relationships and business goodwill. The Kleinbecks expressed concern that the name purchase could cause confusion and result in payments owing to New Monarch to be paid to Old Monarch, and vice versa, but the parties ultimately agreed to the name purchase. It is undisputed that the parties agreed to periodically get together and "settle up" any misdirected payments. According to David Kleinbeck, the reconciliation could be easily accomplished because Crader, who was staying on as the general manager for New Monarch, would have access to the accounting systems for both Old Monarch and New Monarch.

'On September 27, 2007, an asset purchase agreement was executed. New Monarch agreed to purchase the assets of Old Monarch, excluding Old Monarch's accounts receivable for loads shipped on or before September 30, 2007, the closing date of the sale. The total purchase price was $2.5 million, with $2.1 million to be paid at closing. New Monarch financed this portion of the purchase price through a loan with UMB Bank. The remaining $400,000 was financed through a promissory note, personally guaranteed by the Kleinbecks, which was held by SMR Holdings, LLC, a separate company owned by Renkemeyer.

'On September 28, 2007, the parties executed an addendum to the asset purchase agreement, agreeing to the sale of the name "Monarch Transport, LLC." On October 4, 2007, Old Monarch filed with the Kansas Secretary of State, officially changing its name from "Monarch Transport, LLC" to "FKMT, LLC." The next day, New Monarch officially changed its name from "Osage Holdings, LLC" to "Monarch Transport, LLC."

4

'On October 3, 2007, 1 day before the official name change, Old Monarch set up a new deposit account (Account 347) at Peoples Bank under the name "Monarch Transport, LLC" and using Old Monarch's taxpayer identification number. Renkemeyer and Crader were signatories on the account, and the contact information for the account was soon thereafter switched to Renkemeyer's law offices (RCW law offices) rather than the headquarters of the trucking company. Renkemeyer testified that they "didn't really think about" the fact that Account 347 was opened under the name "Monarch Transport, LLC"—it was simply quicker and easier to use that name because Peoples Bank already had all the relevant paperwork and organizational documents. Furthermore, invoices were sent to Old Monarch's customers under the name "Monarch Transport, LLC," and Renkemeyer believed that any incoming checks made out to "Monarch Transport, LLC" could only be deposited into Account 347 under that name.

'According to Renkemeyer, the reason for closing Old Monarch's existing deposit account at Peoples Bank and opening Account 347 was to prevent unwanted automatic withdrawals from Old Monarch's previous vendors. Account 347 would also receive payments for Old Monarch's remaining accounts receivable. It was set up as a lockbox account, meaning that customers would remit their payments to a P.O. Box, which was located in Overland Park and rented by Peoples Bank. Employees of Peoples Bank would collect the payments from the P.O. Box and deposit them into the account on the day they were received. Evidently, the P.O. Box used for Account 347 was the same P.O. Box used to receive payments into Old Monarch's old deposit account.

'Account 347 was subject to a special arrangement between Peoples Bank and Bank of the West. After the sale closing, Old Monarch used the $2.1 million in immediate proceeds to pay off many of its debts, including the equipment loans owed to Bank of the West. But Old Monarch still owed Bank of the West approximately $1.4 million on the

5

line of credit secured by Old Monarch's accounts receivable. Renkemeyer thus authorized Peoples Bank to wire all payments made into Account 347 directly to Bank of the West. The payments were to be applied toward the outstanding balance of Old Monarch's line of credit.

'On October 10, 2007, Crader filed an electronic funds transfer (EFT) form with Delphi, Old Monarch's largest customer representing about 25 percent of Old Monarch's business, instructing them to make payments owing to "Monarch Transport, LLC"—the name by this time owned by New Monarch—into Account 347. The EFT form also used the address and telephone number, formerly belonging to Old Monarch, that had been assumed by New Monarch. Payments from Delphi to Old Monarch had previously been made by EFT rather than paper check, and according to Crader this new EFT form was filed simply to ensure that payments owing to Old Monarch were deposited into the new Account 347 rather than Old Monarch's old deposit account. When asked why he used New Monarch's name, address, and phone number on the form, Crader stated that he "[didn't] recall his thought process . . . , I filled it out and I signed it."

'According to Thomas Kleinbeck, he had instructed Crader at the very beginning of October—before Crader filed the EFT form—to contact Delphi and switch Delphi's payment method to paper check rather than EFT. The purpose of the switch was to ensure that Delphi's payments to Old Monarch and New Monarch were kept separate. Crader denied that Kleinbeck ever instructed him to work with Delphi to switch their payment method; rather, he assumed Kleinbeck would be responsible for that task.

'Also on October 10, 2007, New Monarch opened a deposit account at UMB Bank with a similar lockbox arrangement. Since UMB Bank had extended New Monarch a line of credit, secured by New Monarch's accounts receivable, UMB Bank wanted payments owing to

6

New Monarch to be funneled directly into UMB Bank's P.O. Box located in Kansas City, Missouri.

'In the weeks after the sale, Crader and other New Monarch employees implemented a system for keeping Old Monarch and New Monarch invoicing (both outgoing invoices as well as incoming payment receipts) separate. Old Monarch had used accounting software, McLeod, which was also used by New Monarch after the sale. Each company had different ledgers within the program in order to keep invoicing separated.

'Outgoing invoices were managed by the same employee for both Old Monarch and New Monarch. The outgoing invoices for each company were supposed to be easily distinguishable because Old Monarch's invoices started with a 2, whereas New Monarch's invoices started with 3. Although there was some discussion about using six digits for New Monarch's invoices as opposed to the five digits used for Old Monarch's invoices, that distinction was never implemented and New Monarch also used five-digit invoices. In any case, brightly colored letters were sent out along with New Monarch's invoices, informing customers of the change in ownership and new remittance address to the P.O. Box in Kansas City, Missouri.

'With respect to tracking incoming payment receipts, Crader was responsible for entering that information into the McLeod software for part of his time at Old Monarch and for approximately the first month at New Monarch. Crader testified that for Old Monarch, when he received an incoming payment receipt that contained a check skirt or otherwise indicated which invoice the customer was paying, he would apply the payment to that particular invoice in the McLeod ledger. But if an incoming payment receipt did not indicate which invoice the customer was paying, Crader simply applied the payment to the customer's oldest outstanding invoice.

7

'During the first month for New Monarch, Crader undertook the same process for incoming payment receipts that had been paid into New Monarch's UMB Bank account, entering those payments into the New Monarch ledger. He also continued to handle incoming payment receipts for Old Monarch. Crader would go over to the RCW law offices and collect or make copies of the deposit information for Account 347 (including copies of checks and check skirts) that Peoples Bank had forwarded to RCW. Crader would then enter that information into the Old Monarch ledger. He denied seeing any payment receipts for 3-series (New Monarch) invoices come through Account 347 during that month, but he admitted that there was a lot going on during the transition and he did not "have [his] magnifying glass on walking through the company looking [for] a 3-series invoice." Nonetheless, the evidence at trial showed that Crader had received an e-mail from Delphi indicating that many 3-series invoices were scheduled to be paid.

'Around the end of October or beginning of November 2007, Thomas Kleinbeck asked Crader to scale back his work on Old Monarch and instead focus on New Monarch. After that time, Crader no longer kept track of the incoming payment receipts for deposits made into Account 347. From that point forward, an employee at RCW (where Account 347 deposit information was being sent) tracked incoming payment receipts on a spreadsheet. As incoming payment receipts from Account 347 were forwarded to RCW, an employee would subtract the customer's payment from their outstanding balance. Renkemeyer denied knowing that any of the incoming payment receipts were for 3-series invoices, in part due to the confusion as to how Old Monarch and New Monarch invoices were to be differentiated—*i.e.*, by starting with a 2 or 3 versus using a five-digit or six-digit number. Renkemeyer admitted that nobody at RCW actually looked at or wrote down the invoice numbers before attributing payments on the spreadsheet because he figured those issues would be resolved when the two companies "settled up" as agreed, using source information such as copies of checks and check skirts.

8

'On or about November 5, 2007, New Monarch sent a letter to Old Monarch seeking about $300,000 for costs and lost revenues due to Old Monarch's alleged failure to disclose certain information prior to the sale, such as employee problems, financial difficulties with several vendors, and the disrepair or inoperability of multiple trucks. Old Monarch sent a letter in response, denying some of the allegations but admitting others. Within a few days, a meeting was held between Thomas Kleinbeck (along with New Monarch's lawyer) and Renkemeyer. The parties reached an agreement during the meeting, and Renkemeyer prepared a written "Settlement Agreement and Mutual General Release." Kleinbeck testified that based on the information he and his brother had at that point, they were satisfied with the document and signed the settlement agreement and release.

'The situation between Old Monarch and New Monarch deteriorated rapidly after the parties signed the settlement agreement and release. Thomas Kleinbeck testified that around mid-November 2007, he asked Crader if Old Monarch was receiving any of the payments meant for New Monarch. According to Kleinbeck, Crader did not think Old Monarch had received any misdirected payments but said he would check with Renkemeyer. Likewise, Kleinbeck asked Renkemeyer the same question, and Renkemeyer stated that he would have to check with Crader. Kleinbeck testified that neither man got back to him on the issue. It was around this time that New Monarch first learned of the existence of Account 347.

'By early December 2007, New Monarch had not received several payments that it was expecting, including a large payment from Delphi for loads that had been shipped in early October 2007, and Thomas Kleinbeck asked Crader to contact customers about missing payments. Crader acknowledged that Kleinbeck had asked him to follow up on the missing payments and testified that he had met with the

9

employee at New Monarch responsible for billing, but he did not otherwise recall what he had done in response to Kleinbeck's request. Unsatisfied with Crader's apparent lack of action, Kleinbeck began contacting customers and learned that some customers had made payments on New Monarch invoices, but those payments had not been received by New Monarch. At this point, Kleinbeck believed that New Monarch was being defrauded, likely by Crader and Renkemeyer.

'On December 5, 2007, Renkemeyer, on behalf of RCW, sent a letter to Old Monarch clients in an attempt to collect remaining accounts receivable. In that letter, he stated that Old Monarch used five-digit invoice numbers, whereas New Monarch used six-digit invoice numbers; he did not explain that Old Monarch invoices started with a 2 and New Monarch invoices started with a 3. As a result of that letter, Old Monarch received more payments into Account 347, as well as some payments made out to RCW which were then forwarded to Account 347. At least some of those payments appeared to be for 3-series invoices.

'At the end of December 2007, New Monarch decided to suspend operations for about 1 week over the holidays. Thomas Kleinbeck testified that New Monarch had not received the invoice payments it had expected—in particular, a large payment expected from Delphi—and had been forced to take out an additional loan from UMB Bank to fund operating expenses. Kleinbeck admitted that many employees were unhappy with the decision. Crader also testified that many employees were unhappy with the decision and had either quit or been sent home.

'In early January 2008, when New Monarch again did not receive a large payment that it was expecting from Delphi, Thomas Kleinbeck e-mailed Renkemeyer and stated that he had discovered about $90,000 of Delphi payments that should have gone to New Monarch were instead deposited in Account 347. Renkemeyer replied that Old Monarch had only received about $10,000 into Account 347 over the last month and

10

that, as he understood, the payments were for Old Monarch invoices. Renkemeyer also e-mailed David Kleinbeck, stating that there was obviously a big mistake about the amounts New Monarch thought had been deposited into Account 347 because Old Monarch had not received nearly the amount claimed. According to David, New Monarch had started to receive information from its customers as part of Thomas Kleinbeck's inquiry into the missing payments, including a copy of a payment of a New Monarch invoice that was deposited into Account 347. David Kleinbeck claimed that when he confronted Crader with this document, Crader denied knowing who owned Account 347.

'Around mid-January 2008, New Monarch engaged counsel to work with Old Monarch on the issue of missing or misdirected payments, but an agreement could not be reached. In February 2008, New Monarch fired Crader. Around that time, New Monarch stopped making payments on the seller carryback promissory note held by SMR Holdings. By May 2008 the trucking company was shut down. According to New Monarch, the company's failure was due to lack of operating capital caused by Old Monarch's diversion of invoice payments. According to Old Monarch, the failure was due to a poor business plan and mismanagement by New Monarch, leading to the resignation of many key employees.

'Old Monarch and New Monarch each made their own determinations regarding the diversion of invoice payments. Old Monarch took the position that any payment that had either come into Account 347 or been sent to RCW but was not substantiated by any check skirt or other source documentation indicating the specific invoices for which the payment was intended, clearly belonged to Old Monarch and could be applied against the customer's balance owing to Old Monarch. Furthermore, Old Monarch took the position that any payment it had received—*even if* check skirts or source documentation indicated that all or part of the payment was intended for a 3-series invoice—also belonged to Old Monarch if the customer had any

11

outstanding balance owed to Old Monarch. Any payment over the outstanding balance owed to Old Monarch would be considered as belonging to New Monarch. Renkemeyer and Crader acknowledged that Old Monarch relied only on the check skirts and source documentation provided by Peoples Bank, and where the payment was received without any source documentation, they did not attempt to obtain any additional information from customers regarding the invoices they had intended to pay. Using this methodology, Old Monarch calculated that it owed New Monarch $127,434.90, less any amount that New Monarch owed to Old Monarch.

'In contrast, New Monarch took the position that it should receive any payments that customers had indicated were intended to pay 3-series invoices, whether that intent was manifested through the check skirts and source documentation provided by Peoples Bank or whether the customer had provided that information in response to specific requests made by Thomas Kleinbeck. Using this methodology, New Monarch calculated that Old Monarch owed it $648,028.81. New Monarch also believed that Crader had fraudulently marked these 3-series invoices as paid in New Monarch's McLeod ledger.

'The pretrial conference was held on December 28, 2009. A jury trial was held on January 11-15 and 19-22, 2010. The claims at issue included (1) New Monarch's claims against Old Monarch, Renkemeyer, and Crader for breach of fiduciary duty in relation to the diversion of invoice payments and (2) SMR Holdings' claims against New Monarch, Thomas Kleinbeck, and David Kleinbeck for failure to pay on the seller carryback promissory note. At the close of all evidence, Old Monarch, Renkemeyer, and Crader moved for judgment as a matter of law, arguing that all claims against them were barred by the terms of the settlement agreement and release and that there was insufficient evidence for a reasonable jury to find that Old Monarch, Renkemeyer, and Crader were fiduciaries of New Monarch and each had breached their fiduciary duty

12

regarding invoice payments. SMR Holdings also moved for judgment as a matter of law, arguing that the undisputed evidence showed that the seller carryback promissory note was in default and that New Monarch, Thomas Kleinbeck, and David Kleinbeck owed $427,618.56 in unpaid principal and interest. The district court denied all motions.

'During the jury instructions conference, Old Monarch objected to Instructions 10 and 11, which concerned whether Renkemeyer and Crader had improperly diverted invoice payments under a theory of breach of fiduciary duty. Old Monarch disputed the district court's finding that, as a matter of law, Renkemeyer and Crader were fiduciaries of New Monarch. Old Monarch also argued that the instructions erroneously implied that New Monarch could recover under this theory by showing mere negligence as opposed to intentional acts. Renkemeyer and Crader objected to Instruction 16, which permitted punitive damages if the jury found that either man had acted in a fraudulent matter in relation to the diversion of invoice payments. Finally, Old Monarch requested that the district court include a jury instruction which stated: "It is the law of this state that if a debtor does not direct how a payment should be applied when it makes payment to a creditor, the creditor may apply the payment as it desires." The district court overruled the objections to Instructions 10, 11, and 16 and refused to include Old Monarch's requested instruction.

'The claims were then submitted to the jury. The jury found Old Monarch, Renkemeyer, and Crader liable for breach of fiduciary duty in relation to the diversion of invoice payments and awarded damages in the amount of $647,000 to New Monarch. The jury also found that Renkemeyer had acted in a fraudulent matter [*sic*] such that punitive damages should be awarded. Finally, the jury found that the seller carryback promissory note should be enforced against New Monarch, Thomas Kleinbeck, and David Kleinbeck and awarded damages in the amount of $350,000 to SMR Holdings.

13

'On March 5, 2010, Old Monarch, Renkemeyer, and Crader filed a motion to apply the settlement agreement and release, arguing that the damages awarded by the jury for diversion of invoice payments should be reduced by the amount of payments allegedly diverted on or before the date of the settlement agreement and release. The district court denied the motion.

'On May 18 and August 2, 2010, the district court held hearings on the amount of punitive damages to be awarded against Renkemeyer. In the context of determining how Renkemeyer's actions had adversely affected New Monarch and the Kleinbecks, New Monarch offered evidence that the State of Kansas had filed tax warrants against New Monarch and the Kleinbecks for unpaid taxes stemming in part from the time the trucking company was still owned by Old Monarch. Renkemeyer stated that he had never seen the tax warrants before but conceded that some of the taxes were for years when Old Monarch was in operation. Renkemeyer believed it was New Monarch's responsibility to contact the State and explain the mixup, but he offered to submit an affidavit to the State, if necessary, confirming when the sale took place. The district court placed the responsibility on Renkemeyer, on behalf of Old Monarch, to contact the State and get the issue resolved. Finally, the district court awarded punitive damages against Renkemeyer in the amount of $150,000.

'The journal entry of judgment was filed on September 23, 2010. On October 7, 2010, Old Monarch, Renkemeyer, and Crader filed a renewed motion for judgment as a matter of law or alternatively a new trial and a motion to alter or amend the judgment. SMR Holdings also filed a renewed motion for judgment as a matter of law or alternatively a motion to alter or amend the judgment. Following a hearing, the district court denied all postjudgment motions. Old Monarch, Renkemeyer, Crader, and SMR Holdings timely appealed.'

14

"9.      On January 29, 2010, the respondent self-reported the entry of judgment to the disciplinary administrator.

"10.     On appeal, August 17, 2012, the Kansas Court of Appeals affirmed the judgment of the district court, concluding, in part:

> 'Although Renkemeyer offered explanations for each of these actions, there was sufficient evidence for a reasonable jury to make inferences and conclude that Renkemeyer had acted in a fraudulent manner. Jury Instruction 16 is clear, accurately states the law with respect to punitive damages, and could not reasonably have misled the jury. We conclude the district court did not err in denying Renkemeyer's motion for judgment as a matter of law and overruling his objection to Jury Instruction 16.'

"11.     On December 3, 2013, the parties filed Satisfactions of Judgment.

"12.     Also on December 3, 2013, Monarch Transport ('New Monarch') and FKMT, LLC ('Old Monarch'), Mr. Crader, and the respondent filed a joint motion to amend the entry of judgment. The parties provided the court with a 'Proposed First Amended Journal Entry as to Claims Other Than Those Against Peoples Bank—Jury Trial.'

"13.     In comparing the original journal entry to the first amended journal entry, the parties eliminated six pages which set forth the awards of damages. In its place, the parties substituted the following:

> 'The jury found in favor of New Monarch against Old Monarch, Scot Crader, and Troy Renkemeyer for damages of $150,000.00. No liability was found against Renkemeyer, Campbell & Weaver, LLP. After returning their Verdict A and the answers to special interrogatories the

jury was discharged on January 22, 2010, from further consideration of this case.'

"14. On June 30, 2014, Ms. Hughes filed a formal complaint in this attorney disciplinary case.

"15. Shortly thereafter, on July 14, 2014, Judge Paul Gurney entered the first amended journal entry.

"16. Thereafter, 4 days later, on July 18, 2014, the respondent filed a motion for an extension of time to file an answer in the instant attorney disciplinary case. The hearing panel granted the respondent's motion. On August 7, 2014, the respondent filed an answer to the formal complaint.

"17. In his answer, in response to an allegation that the jury found clear and convincing evidence that the respondent breached a fiduciary duty, the respondent admitted the allegation but stated:

'For further answer, Respondent states the amended judgment states "the jury found in favor of New Monarch against Old Monarch, Scot Crader and Troy Renkemeyer for damages of $150,000." Said judgment does not mention a breach of fiduciary duty.'

"18. On August 13, 2014, Judge Gurney entered an order setting aside the first amended journal entry. In the order, Judge Gurney stated:

'Now on this 13th day of August, 2014, the Court on its own, pursuant to K.S.A. 60-260(a), hereby sets aside the First Amended Journal Entry as to Claims Other Than Those Against Peoples Bank— Jury Trial (Doc. No. 286). The Court finds that although the parties submitted a Joint Motion to Amend Entry of Judgment (Doc. No. 283), the Motion fails to provide a basis under which an amended journal entry is timely and warranted. The Court therefore finds that the Journal Entry

16

(Dock No. 240) entered on September 23, 2010[,] shall remain controlling. Upon request for a hearing, the Court will afford the parties an opportunity to present argument, in support of the Joint Motion to Amend Entry of Judgment. Any such request shall be made within ten days from the date this Order is entered.'

Old Monarch, Crader, and Renkemeyer filed a request for hearing. On October 2, 2014, the court conducted a hearing. Following the hearing, the court denied the request for an amendment to the judgment. Six days later, the hearing panel conducted the hearing on the formal complaint in this case.

"*Conclusions of Law*

"19.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 8.4(c) and KRPC 8.4(g), as detailed below.

"KRPC 8.4(c)

"20.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty when he breached his fiduciary duty and acted in a fraudulent manner.' As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"KRPC 8.4(g)

"21.    'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The respondent engaged in conduct that adversely reflects on his fitness to practice law when he breached his fiduciary duty and 'acted in a fraudulent manner.' The hearing panel concludes that the respondent violated KRPC 8.4(g).

17

"22.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"23.     *Duty Violated*.  The respondent violated his duty to the public to maintain his personal integrity.

"24.     *Mental State*.  The respondent knowingly and intentionally violated his duty.

"25.     *Injury*.  As a result of the respondent's misconduct, the respondent caused actual injury to New Monarch.

"Aggravating and Mitigating Factors

"26.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"27.     *Dishonest or Selfish Motive*.  The respondent acted in a fraudulent manner. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by dishonesty.

"28.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its

recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"29.    *Absence of a Prior Disciplinary Record*.  The respondent has not previously been disciplined.

"30.    *Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct*.  The respondent paid $150,000 of his personal funds to satisfy the judgment entered in this case.

"31.    *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions*.  The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations.

"32.    *Imposition of Other Penalties or Sanctions*.  The respondent has experienced other sanctions for his conduct. The respondent paid the $150,000 judgment entered against him.

"33.    *Remorse*.  At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct.

"34.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'5.11    Disbarment is generally appropriate when:

. . . .

(b)    a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious adversely reflects on the lawyer's fitness to practice.

19

'5.12     Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

'5.13     Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.'

"*Recommendation*

"35.     Arguing that the respondent engaged in intentional conduct, the disciplinary administrator recommended the respondent be suspended from the practice of law for a period of 1 year. Counsel for the respondent argued that the respondent was slow and sloppy, not a thief, and censure to be published in the Kansas Reports was the appropriate discipline.

"36.     The respondent's misconduct in this case is serious—he breached his fiduciary duty and acted in a fraudulent manner. According to ABA Standards 5.11 and 5.13, the respondent's misconduct warrants either disbarment (if the conduct was intentional) or censure (if the conduct was done knowingly). The hearing panel concludes that disbarment is not warranted in this case, as the mitigating circumstances are compelling. The hearing panel concludes that a censure is not an appropriate discipline to impose when an attorney has engaged in fraud. Suspension is the appropriate discipline to impose in this case. Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended from the practice of law for a period of 6 months.

"37.     Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

20

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2014 Kan. Ct. R. Annot. 363). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of the hearing before the panel and the hearing before this court. The respondent did not file exceptions to the hearing panel's final hearing reports. The hearing panel's findings of fact are thus deemed admitted. Supreme Court Rule 212(c) and (d) (2014 Kan. Ct. R. Annot. 383).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct violated KRPC 8.4(c) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct involving misrepresentation) and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law), and it supports the panel's conclusions of law. We therefore adopt the panel's conclusions.

At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator repeated its recommendation that respondent be suspended for a period of 1 year. The respondent expressed agreement with the panel's recommendation of a 6-month suspension.

21

This court is not bound by the recommendations of the Disciplinary Administrator or the hearing panel. *In re Mintz*, 298 Kan. 897, 911-12, 317 P.3d 756 (2014). The court bases each disciplinary sanction on the specific facts and circumstances of the violations and aggravating and mitigating circumstances presented in the case. *Mintz*, 298 Kan. at 912. This court has taken the position that, while prior cases may have some bearing on the sanctions that the court elects to impose, those prior cases must give way to consideration of the unique circumstances that each individual case presents. *In re Busch*, 287 Kan. 80, 86-87, 194 P.3d 12 (2008). This court concerns itself less with the sanctions that were appropriate in other cases and more with the discipline that is appropriate under the facts of the case before us. *In re Dennis*, 286 Kan. at 738.

At the hearing before this court, respondent's counsel argued that his client was guilty of sloppy recordkeeping after the trucking company sale and that the filing of the amended journal entry after disciplinary proceedings were under way was the work of lawyers representing his client in the civil litigation, rather than based on any desire or action of his client. Given the record compiled in the lawsuit, the record of the panel hearing, and the respondent's decision not to file exceptions to the panel's findings and conclusions, counsel's efforts to minimize respondent's culpability for dishonesty were unpersuasive.

When respondent spoke for himself at the hearing before this court, he asserted that he had not thought of himself as a fiduciary in the trucking company transaction, that he had been a passive investor who thought of himself as a mere seller, and that he had left the details of receivables and their correct distribution to his fellow seller. These arguments do not fill us with confidence that, even today, respondent has a firm grasp on the nature and wrongfulness of his ethical lapses, and we are particularly troubled because of his substantial training and experience not only as a tax lawyer but also as a certified public accountant.

22

For its part at the hearing before this court, the Disciplinary Administrator's office urged us to reevaluate the applicable aggravators and mitigators and the balance to be struck between them. For example, the Deputy Disciplinary Administrator urged us to find the existence of an additional aggravator, a pattern of misconduct in the many payments that were misdirected.

Even without engaging in the reevaluation and reweighing for which the Disciplinary Administrator's office advocated, we have no hesitance in ruling unanimously that a 1-year suspension from the date of the filing of this opinion is the appropriate discipline for respondent. Further, we caution him explicitly that he must notify each of his clients, in writing, of his suspension. See Supreme Court Rule 218 (2014 Kan. Ct. R. Annot. 414).

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Troy D. Renkemeyer be and is hereby disciplined by a 1-year suspension from the practice of law, effective on filing of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2014 Kan. Ct. R. Annot. 306).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.